UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMICA MUTUAL INSURANCE COMPANY,
    Plaintiff,

    v.
                                  CIVIL ACTION NO.
                                  13-11416-MBB

ROBERT KAHN, as the Administrator
of the Estate of Ruth Solomont,
and HARRIET KAHN,
    Defendants.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFF AMICA MUTUAL INSURANCE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 24)**

**August 12, 2014**


**BOWLER, U.S.M.J.**

    Pending before this court is a motion for summary judgment
filed by plaintiff AMICA Mutual Insurance Company ("plaintiff"
or "Amica").  Defendants Robert Kahn, as the Administrator of
the Estate of Ruth Solomont ("Solomont"), and Harriet Kahn
(collectively "defendants" or "the Kahns") oppose the motion.
(Docket Entry # 27).  After conducting a hearing, this court
took the motion (Docket Entry # 24) under advisement.

PROCEDURAL BACKGROUND

    Plaintiff filed a complaint against defendants seeking a
declaratory judgment determining the parties' respective rights
and obligations under an automobile insurance policy issued by

plaintiff to defendants. (Docket Entry # 1). The complaint seeks a declaration that there is no coverage for an underinsured motorist claim arising out of an October 4, 2006 accident involving Solomont because: (1) Solomont was not a member of defendants' "household" at the time of the accident; (2) defendants failed to properly notify plaintiff of the accident and plaintiff was materially prejudiced by the delay; and (3) Solomont executed a settlement agreement with the alleged tortfeasor, the driver of the vehicle in which Solomont was injured, without plaintiff's consent thereby causing plaintiff to suffer material prejudice.

STANDARD OF REVIEW

Summary judgment is appropriate if the "record reveals 'no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014); see also Caban-Rodriguez v. Jimenez-Perez, 2014 WL 959489, at *1 (1st Cir. March 12, 2014) (applying "the same legal standard as the district court" when reviewing summary judgment).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard,  750 F.3d 30, 38 (1st Cir. 2014).  The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor.  Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file."  Id.  "Unsupported allegations and speculation" however "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").  Adhering to this framework, the record sets out the following facts.

FACTUAL BACKGROUND

Plaintiff issued defendants an automobile insurance policy with effective dates of August 1, 2006 to August 1, 2007 ("the Amica policy").[1]  (Docket Entry # 25-1).  Solomont, now deceased,

---

[1]  As set forth in paragraph seven of the complaint (Docket Entry # 1) and paragraph seven of the answer (Docket Entry # 5),

was Harriet Kahn's mother. (Docket Entry # 27, Ex. L, p. 10)
(Docket Entry # 27, Ex. M, p. 4). Robert Kahn is the
administrator of Solomont's estate. (Docket Entry # 1, ¶ 3)
(Docket Entry # 5, ¶ 3).

I.  The Accident

On October 4, 2006, Solomont was riding in the passenger
seat of a 1999 Subaru Legacy owned and driven by her private
home health care aide, Camille Caruso ("Caruso"). (Docket Entry
# 25-2) (Docket Entry # 27, Ex. M, p. 23). Caruso worked for
Comfort Keepers, a home health care franchise based in Newton,
Massachusetts. (Docket Entry # 25-4). Caruso was traveling
straight on Commonwealth Avenue in Newton, Massachusetts when
she turned to speak to Solomont and drove through a red light.
(Docket Entry # 25-2, p. 3). Caruso then struck an automobile
traveling straight on Lowell Avenue. (Docket Entry # 25-2, p.
3). When police officers arrived at the scene, they spoke with
a witness to the accident who confirmed this sequence of events.
(Docket Entry # 25-2, p. 3). Solomont was taken by ambulance to
Newton Wellesley Hospital. (Docket Entry # 25-2, p. 3).

Prior to the accident, Solomont suffered from cardiac
disease, hypertension and arthritis that affected her joints.

_____

the parties agree that the policy's effective dates were March
30, 2006 to March 30, 2007. The Amica policy in the record,
however, reflects effective dates of August 1, 2006 to August 1,
2007. (Docket Entry # 25-1). The discrepancy is not material
because the accident took place in October 2006.

She also "took blood pressure pills" and "had severe anemia." (Docket Entry # 27, Ex. L, p. 48) (Docket Entry # 27, Ex. M, pp. 27, 30). Solomont was unable to drive herself and had private aides drive her various places but was otherwise self-sufficient. (Docket Entry # 27, Ex. M, p. 27) (Docket Entry # 27, Ex. L, pp. 46-47). Private home health aides assisted Solomont for "several hours" each week. (Docket Entry # 27, Ex. M, p. 21).

Solomont suffered bruises and a fractured sternum from the accident. (Docket Entry # 27, Ex. M, p. 30). She spent two nights at Newton Wellesley Hospital. (Docket Entry # 27, Ex. M, p. 32). Upon her discharge, Solomont returned to an apartment at defendants' residence where she required 24 hour care. (Docket Entry # 27, Ex. M, pp. 35-37). Viewing the record in defendants' favor, Caruso took care of Solomont after the accident before she traveled back to Florida.

Harriet Kahn testified by examination under oath that Solomont "was on pain pills" after the accident but she could not remember how long Solomont took the pain pills or if Solomont had any physical therapy after the accident. (Docket Entry # 27, Ex. M, p. 30). Harriet Kahn also could not recall if Solomont had any medical treatment when she returned to Florida in late December 2006. Harriet Kahn's memory of other aspects of Solomont's post accident injuries was incomplete.

Testifying by examination under oath, Robert Kahn described that Solomont had difficulty walking because of the pain and needed assistance for normal activities such as dressing and cooking. (Docket Entry # 27, Ex. L, p. 59). He did not know if Solomont sought treatment with any other health care providers after her release from Newton Wellesley Hospital. (Docket Entry # 27, Ex. L, p. 56). Solomont died on December 23, 2009.

At the time of the accident, Caruso had an automobile insurance policy issued by American Automobile Insurance Company ("AA Insurance") with liability limits of $20,000. (Docket Entry # 1, ¶ 22) (Docket Entry # 5, ¶ 22). On November 4, 2008, 25 months after the accident, Solomont signed a covenant not to execute against Caruso's assets and to release AA Insurance insofar as the company insures Caruso ("the covenant"). (Docket Entry # 25-8). The covenant did not release any "rights relative to PIP, Medical Payments, and Underinsurance or Uninsurance under any policies of insurance." (Docket Entry # 25-8). It also did not release Solomont's "rights to proceed against Comfort Keepers, Brook Care, LLC, Donovan Insurance Agency, Lockton Risk Management, Hanover Insurance [or] C.K. Franchising, Inc." (Docket Entry # 25-8). Under the covenant, Solomont released AA Insurance and agreed not to pursue any claim against the personal assets of Caruso in consideration of

a payment of the $20,000 AA Insurance policy limit. (Docket Entry # 25-8, Ex. H).

Caruso owned the 1999 Subaru Legacy. (Docket Entry # 27, Ex. M, p. 23). At the time of her February 2012 deposition, she rented her home, was unemployed and received social security. (Docket Entry # 25-4, Ex. D). Harriet Kahn testified that Caruso "had no money" and was "struggling." (Docket Entry # 27, Ex. M, p. 38). Plaintiff was never made aware of and did not consent to the covenant. (Docket Entry # 25-9, Ex. I).

## II. The Amica Policy

The Amica policy provides coverage for "bodily injury caused by an underinsured auto." (Docket Entry # 25-1, p. 6). The relevant provision setting out such coverage reads:

> Sometimes an owner or operator of an auto legally responsible for an accident is underinsured. Under this Part, we will pay damages for bodily injury to people injured or killed as a result of certain accidents caused by someone who does not have enough insurance.
>
> We will only pay if the injured person is legally entitled to recover from the owners or the operators of all underinsured autos. Such injured person has a claim under this Part when the limits for automobile bodily injury liability insurance covering the owners and operators of the legally responsible autos are:
>
> > 1. Less than the limits shown for this Part on your Coverage Selections Page [$250,000/$500,000]; and
> > 2. Not sufficient to pay for the damage sustained by the injured person.
>
> We will pay damages to or for:

> 1.  You, while occupying your auto, while occupying an
> auto you do not own, or if injured as a pedestrian.
> 2.  *Any household member*, while occupying your auto,
> *while occupying an auto not owned by you*, or if
> injured as a pedestrian.

(Docket Entry # 25-1, p. 6) (emphasis added and bold face type

omitted).  The Amica policy defines "household member" as

"anyone living in [the insured's] household who is related to

[the insured] by blood, marriage or adoption."  (Docket Entry #

25-1, p. 5).

The Amica policy additionally includes a "consent-to-

settlement" provision.  In pertinent part, the provision reads

that:

> If an injured person settles a claim as a result of an
> accident covered under this part, we will pay that person
> only if the claim was settled with our consent.  We will
> not be bound under this Part by any judgment resulting from
> a lawsuit brought without our written consent.  We will
> not, however, unseasonably withhold our consent.

(Docket Entry # 25-1, p. 8).

Finally, the policy contains a notice provision that

requires the insureds to promptly notify the company of any

accident or loss.  The applicable language states that:

> We do not know about accidents or losses until you or
> someone else notify us.  We, or our agent, must be notified
> promptly of the accident or loss by you or someone on your
> behalf.  The notification should include as many details as
> possible, including names and addresses of drivers, injured
> persons and witnesses.  If you or any person seeking
> payment under this policy fails to notify us promptly of an
> accident or claim . . ., we may not be required to pay
> claims under any of these parts.

(Docket Entry # 25-1, p. 9).

III.  <u>Solomont's Household Status and Notice of Claim</u>

Defendants have resided at 24 Manor House Road in Newton

for the past 37 years.  (Docket Entry # 25-3, p. 3).  Solomont

owned a condominium in Delray Beach, Florida for approximately

20 years before her death in 2009.  (Docket Entry # 25-3, p. 9).

At the time of the accident, she was a resident of Florida and

had a homestead exemption on her Florida condominium.  (Docket

Entry # 25-3, pp. 9, 21) (Docket Entry # 25-5, Ex. E).  The

September 2010 order determining Solomont's homestead status

declared that she "was domiciled in Palm Beach County, Florida."

(Docket Entry # 25-5, Ex. E).  After her death, Solomont's

estate was probated in Florida.  (Docket Entry # 1, ¶ 18).  From

2000 to 2009, Solomont was registered to vote in Florida.

(Docket Entry # 27, Ex. M, p. 17).

For all of her married life until her husband's death in

1999, Solomont lived in Lowell, Massachusetts and spent less

than half of each year in Florida.  (Docket Entry # 27, Ex. M,

p. 8).  Immediately following her husband's death, Solomont

moved into defendants' Newton residence.  (Docket Entry # 27,

Ex. M, p. 10).  From 1999 until the accident in 2006, Solomont

spent from early May to sometime in November each year with

defendants in Newton and the rest of the year in her condominium

in Florida.  (Docket Entry # 27, Ex. M, pp. 10-11).

In 2000, defendants and Solomont had a garden apartment constructed for Solomont on defendants' property for approximately $500,000. (Docket Entry # 27, Ex. L, p. 15) (Docket Entry # 27, Ex. M, p. 15). Solomont paid "most of" the "approximately $500,000" of construction costs. (Docket Entry # 25-3, pp. 15-16, 41). The construction was complete in or around 2004. (Docket Entry # 27, Ex. L, p. 18).

The apartment is connected to the main house and shares the same address. (Docket Entry # 27, Ex. M, p. 16). There is a door with access to the apartment as well as a separate access door. (Docket Entry # 25-3, p. 8). The apartment contains one bedroom, a kitchen, a living room, a hobby room and an attic. (Docket Entry # 25-3, p. 15). It also had a dedicated telephone line when Solomont lived there. (Docket Entry # 25-3, p. 16) (Docket Entry # 27, Ex. L, p. 16). Solomont paid a proportional share of the property taxes and utility bills roughly based on the square footage of the apartment. (Docket Entry # 25-3, p. 14) (Docket Entry # 27, Ex. L, p. 14). Robert Kahn did not declare this money as rental income in his tax returns and did not know whether the amount appeared in any tax return. (Docket Entry # 25-3, p. 14).

Solomont had a primary care physician in Massachusetts and one in Florida although she saw the one in Massachusetts more often. (Docket Entry # 27, Ex. L, p. 42) (Docket Entry # 27,

Ex. M, pp. 15 & 42). She belonged to synagogues in both Florida and Massachusetts. (Docket Entry # 27, Ex. M, p. 28). When traveling from Florida to Massachusetts, Solomont left all of her furniture and "very little" clothing in Florida. (Docket Entry # 25-3, p. 19) (Docket Entry # 27, Ex. M, p. 12). A Massachusetts attorney drafted Solomont's will, which was probated in Florida. (Docket Entry # 27, Ex. L, pp. 22-23). Solomont filed Massachusetts tax returns until approximately 1990, after which time she filed no state tax returns because Florida does not require them. (Docket Entry # 27, Ex. L, p. 40). She had federal tax returns prepared by a Massachusetts accountant at least for the years of 2003 to 2007. (Docket Entry # 27, Ex. L, pp. 39-40). Solomont had a bank account in Florida and a bank account in Massachusetts. (Docket Entry # 27, Ex. L, p. 35) (Docket Entry # 27, Ex. M, p. 18).

Although the last driver's license Solomont had was issued in Florida, she did not have one at the time of the accident and had not had one for the preceding three years. (Docket Entry # 27, Ex. M, pp. 14-15). Solomont owned a Florida registered Cadillac that was driven between Florida and Massachusetts before the accident. (Docket Entry # 27, Ex. L, p. 27) (Docket Entry # 27, Ex. M, p. 13). After the accident, the Cadillac remained in Massachusetts. (Docket Entry # 25-3, pp. 26-27) (Docket Entry # 27, Ex. L, p. 27).

Solomont was not financially dependent on defendants but in
1999 Robert Kahn became responsible for handling her financial
affairs. (Docket Entry # 27, Ex. L, p. 13). Solomont had all
of her financial mail sent to defendants in Newton, including
the bank statements from her account in Florida. (Docket Entry
# 27, Ex. M, p. 18).

Robert Kahn was a co-signatory on all of Solomont's bank
accounts and he paid the majority of her bills from her bank
account in Massachusetts. (Docket Entry # 27, Ex. L, pp. 34,
37). He also gave her advice on investments and made
investments for her. (Docket Entry # 27, Ex. L, p. 37).
Harriet Kahn paid the bills relating to Solomont's health care
before and after the accident. (Docket Entry # 27, Ex. M, pp.
43, 45). The only bills that Solomont paid herself were for her
hair dresser and dry cleaning. (Docket Entry # 27, Ex. L, p.
34). Prior to the accident, defendants purchased a tenant's
insurance policy for Solomont's jewelry. (Docket Entry # 27,
Ex. M, p. 51).

At the time of the accident in October 2006, Solomont was
residing in Newton. (Docket Entry # 27, Ex. M, pp. 10, 23, 24,
31). After Solomont was released from Newton Wellesley
Hospital, she returned to defendants' residence where she
remained until late December 2006. (Docket Entry # 27, Ex. L,
p. 79). She then went back to her Florida condominium where she

continued receiving 24 hour care.  (Docket Entry # 27, Ex. M, p. 20).  In May 2007, Solomon returned to Massachusetts.  (Docket Entry # 27, Ex. M, p. 42).  She made two subsequent trips to Florida in 2008 and 2009.  (Docket Entry # 27, Ex. M, p. 43).

In March 2009, Solomont was hospitalized because of dehydration at a hospital in Delray Beach, Florida.  Thereafter, she went to a rehabilitation center in Boca Raton, Florida. When examined under oath, Harriet Kahn could not remember the name of the facility.  Solomont was hospitalized again in Delray Beach and returned to the same rehabilitation center upon release from the hospital.  During this time period, Harriet Kahn visited Solomont a number of times.  A home health care agency in Boca Raton, Elder Alternatives, supplied health care aides for Solomont.  (Docket Entry # 27, Ex. M, pp. 5-8). Around August 2009, she returned to Massachusetts and entered the Epoch Nursing Home in Weston until her death in December 2009.  (Docket Entry # 27, Ex. L, p. 62) (Docket Entry # 27, Ex. M, pp. 5-7, 43).

Robert Kahn made one and "possibly even two" claims on the Amica policy unrelated to the accident.  (Docket Entry # 27, Ex. L, p. 77).  He handled each claim directly and contacted plaintiff by telephone to report the accident[s].  (Docket Entry # 27, Ex. L, pp. 77-78).

More than five years after the accident, an attorney
representing Robert Kahn, as administrator of Solomont's estate,
wrote a letter to plaintiff expressing an intention to pursue an
underinsured motorist claim on behalf of the estate.[2] (Docket
Entry # 29, ¶ 32) (Docket Entry # 25-9, Ex. I) (Docket Entry #
25-10, Ex. J). Plaintiff received the letter on March 13, 2012.
(Docket Entry # 25-9). A Senior Claims Supervisor at Amica
attests that the letter was "the first time" Amica was notified
of the accident and the intention to file an underinsured
motorist claim. (Docket Entry # 25-9). Robert Kahn testified
that he believed that plaintiff was first notified in late 2011.
(Docket Entry # 27, Ex. L, p. 72). Resolving this factual
dispute in defendants' favor, defendants notified plaintiff
about the accident in late 2011, more than five years after the
accident.

The police report of the accident identifies Mary Koch as a
witness albeit without an address. (Docket Entry # 25-2).
Robert Kahn testified that he did not know who she was and that
he did not talk to the police about the accident. (Docket Entry
# 27, Ex. L, p. 74).

Defendants first went to see an attorney relative to filing
a claim against Caruso and her employer, Comfort Keepers,

---

[2]   Harriet Kahn testified that she never had any
communications with plaintiff. (Docket Entry # 27, Ex. M, p.
40).

14

approximately six months after the accident.[3]  (Docket Entry #
27, Ex. L, pp. 56, 64-65).  Solomont and/or the Kahns retained
the attorney at the time (Docket Entry # 27, Ex. L, p. 65) and
on November 4, 2008, Solomont executed the covenant releasing AA
Insurance and agreeing not to execute against Caruso's personal
assets.  (Docket Entry # 25-8).

In 2009, Solomont or Robert Kahn, as the administrator of
Solomont's estate, filed suit against Caruso and Caruso's former
employer, Brook Care Group LLC, doing business as Comfort
Keepers ("the 2009 lawsuit").[4]  (Docket Entry # 27, Ex. L, p. 56)
(Docket Entry # 25-4, p. 2).  Filed in Massachusetts Superior
Court (Middlesex County), the 2009 lawsuit includes a claim that
Caruso caused Solomont's injuries.  In addition to Caruso and
her former employer, the suit names as defendants Lockton Risk
Services, Inc., Double K Enterprises, LLP and C.K. Franchising,
Inc., doing business as Comfort Keepers.  Robert Kahn, as
administrator of Solomont's estate, is seeking an estimated
$500,000 or $560,000 in the lawsuit.  He testified that the
damages primarily relate to the 24 hour home health care and

---

[3] Defendants in fact went to see two attorneys.  Because
the first attorney was getting "nothing" done, they went to see
a second attorney.  (Docket Entry # 27, Ex. M, p. 39).
[4] This court draws the reasonable inference that Solomont
or Robert Kahn filed the suit in 2009 because the case has a
civil action number of "09-3788."  (Docket Entry # 25-4).

nursing home care Solomont received after the accident.[5]  (Docket
Entry # 27, Ex. L, pp. 58 & 62).

Before her death, Solomont did not make a recorded
statement under oath about the accident or about how she felt.
Plaintiff never had the opportunity to conduct an independent
medical examination ("IME") of Solomont before her death.
Whereas the Kahns were deposed in the 2009 suit, Solomont was
not deposed.[6]

## DISCUSSION

Among other arguments, plaintiff maintains it was
materially prejudiced by the late notice of the claim.
Specifically, plaintiff submits that the delay deprived it of
the opportunity to conduct an IME of Solomont and to examine her
under oath.

The Amica policy requires claimants to submit to an IME.
The relevant language states that, "[W]e have a right to require
that [a claimant] be examined by doctors selected by us."
(Docket Entry # 25-1, p. 9).  The policy also allows the company

---

[5]  During Robert Kahn's examination under oath, plaintiff's
counsel impeached his testimony that Solomont could not cook or
dress herself with Caruso's deposition testimony that Solomont
returned to her pre-accident condition by December 2006.
[6]  When asked if her "mother ever made a recorded statement
about the accident where someone recorded what she observed or
felt," Harriet Kahn answered, "No."  (Docket Entry # 27, p. 45).
A deposition is a recorded statement.  Fed.R.Civ.P. 30(b)(3) &
(f).  Hence, the only reasonable inference from the record is
that Solomont was not deposed.

to examine a claimant under oath.  The relevant language states that, "We may also require you and any [claimant] to submit to an examination under oath."  (Docket Entry # 25-1, p. 9).

In order to deny coverage, an insurer must show "both that the notice provision was in fact breached and that the breach resulted in prejudice to its position."  Johnson Controls, Inc. v. Bowes, 409 N.E.2d 185, 188 (Mass. 1980).  A showing of prejudice is required.  Goodman v. American Casualty Co., 643 N.E.2d 432, 434 (Mass. 1994) (insurer "must prove that it was prejudiced by an insured's delay in notifying it").  Indeed, an insured's failure to provide timely notice to the company does not provide a basis to deny underinsured motorist coverage unless "that delay *materially* prejudiced the company."  Lighter v. Lumbermens Mutual Casualty Insurance Co., 683 N.E.2d 297, 299 (Mass.App.Ct. 1997) (emphasis added).  Furthermore, where, as here, the claim is for "underinsured motorist coverage, a late notified insurer may well not be prejudiced because, by definition, there is another insurer involved whose investigation of the occurrence could fulfil the investigative needs of the underinsured motorist insurer."[7]  Goodman v. American Casualty Co., 643 N.E.2d at 435.

---

[7]  The prejudice rule arises from Massachusetts common law because the statutory prejudice requirement in Massachusetts General Laws chapter 175, section 112 ("section 112") applies only to liability insurance.  See Goodman v. American Casualty

Timely notice allows the insurer to conduct a "'seasonable investigation of the facts relating to liability.'" Johnson Controls, Inc. v. Bowes, 409 N.E.2d at 187 (quoting Bayer & Mingolla Construction Co. v. Deschenes, 205 N.E.2d 208, 212 (Mass. 1965)). A policy provision that requires prompt notice "'is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been in had timely notice been provided'" such as "'being forced to pay a claim against which it has not had an opportunity to defend effectively.'" Id. (quoting Brakeman v. Potomac Insurance Co., 371 A.2d 193, 196 (Pa. 1977)). An insurance contract is nonetheless not a negotiated agreement and the insurer by and large dictates the terms of the agreement. Id. When the late notice does not harm the insurer's interests, it is neither fair nor logical "'to relieve the insurance company of its obligations under the policy in such a situation.'" Id. at 187-188 (quoting Brakeman v. Potomac Insurance Co., 371 A.2d at 196); see also 6 Jeffrey E. Thomas & Christopher J. Robinette New Appleman on Insurance Law § 63.14[1] (2011) (listing three

---

Co., 643 N.E.2d at 434. The SJC in Goodman nevertheless found no distinction "between liability coverage and uninsured or underinsured motorist coverage that would call for the application of a different rule concerning the question whether the insurer must prove that late notice to it was prejudicial." Id. Cases determining prejudice under section 112 are therefore instructive in determining the existence of prejudice in the case at bar. See Darcy v. Hartford Insurance Co., 554 N.E.2d 28, 31 n.4 (Mass. 1990).

justifications for requiring prejudice, namely, "adhesive nature
of insurance contracts," compensating tort victims and avoiding
windfall to insurer based on technicality).

In the case at bar, the Amica policy required the insureds
to promptly notify the company of an accident. (Docket Entry #
25-1, p. 9). By waiting more than five years to notify
plaintiff about the accident, defendants undeniably failed to
give plaintiff notice in a timely manner. Having breached the
notice provision, the summary judgment issue reduces to the
issue of material prejudice.

A delay in providing notice, even an extreme delay of more
than five years, does not, without more, establish actual
prejudice. Darcy v. Hartford Insurance Co., 554 N.E.2d 28, 31
(Mass. 1990) (declining to adopt presumption of prejudice
notwithstanding "more than five-year delay"); Lighter v.
Lumbermens Mutual Casualty Insurance Co., 683 N.E.2d at 299
(delay, "[s]tanding alone," insufficient to show "notification
materially prejudiced" insurer even if delay is "'extreme'" and
citing case of five year delay); see Goodman v. American
Casualty Co., 643 N.E.2d at 434-435. Plaintiff, as the insurer,
bears the burden to identify "precisely how the delay has caused
it to suffer prejudice." Lighter v. Lumbermens Mutual Casualty
Insurance Co., 683 N.E.2d at 299 (citing Darcy v. Hartford
Insurance Co., 554 N.E.2d at 32); Pilgrim Insurance Co. v.

Molard, 897 N.E.2d 1231, 1240 (Mass.App.Ct. 2008) ("generalities are insufficient" to prove prejudice).

Delay is nonetheless "a relevant factor to be considered in combination with other facts or circumstances." Lighter v. Lumbermens Mutual Casualty Insurance Co., 683 N.E.2d at 299; Darcy v. Hartford Insurance Co., 554 N.E.2d at 31 (length of delay "in notice will always be a relevant factor to be considered in determining whether actual prejudice has been shown by an insurer"). An example of such other facts and circumstances where the delay may establish prejudice occurs when the delay results in "the loss of critical evidence, or testimony from material witnesses despite diligent good faith efforts on the part of the insurer to locate them which demonstrate that the insurer's interests have actually been harmed." Darcy v. Hartford Insurance Co., 554 N.E.2d at 31-32; see also Lighter v. Lumbermens Mutual Casualty Insurance Co., 683 N.E.2d at 299 & n.4 (applying Darcy, which involved liability insurer's attempt to avoid coverage due to delay in giving notice and prejudice under section 112, to underinsured motorist coverage case).

Plaintiff submits that it suffered prejudice because critical evidence from Solomont regarding the extent of her injuries no longer exists because of the late notice of the claim several years after her death. In particular, plaintiff

lost the opportunity to conduct an IME of Solomont by plaintiff's own physicians. Plaintiff also lost the opportunity to conduct an examination under oath of Solomont and it lost the opportunity to depose Caruso and defendants about the extent of Solomont's injuries and medical care when their memories were still fresh.

Case law recognizes the investigative importance of conducting both an examination under oath of the injured claimant and an IME. The "purpose of an examination under oath is to assist the insurer in determining . . . the 'nature and extent of the injured person's injuries and loss, and the medical treatment received.'" Western National Insurance Co. v. Thompson, 797 N.W.2d 201, 206 (Minn. 2011). An IME likewise allows the insurer to investigate and verify the claimant's physical condition. See Trinidad v. Pilgrim Insurance Co., 2009 WL 3844469, at *2 (Mass.App.Div. Nov. 12, 2009). In fact, the refusal to conduct the IME in Trinidad placed the insurance company "in the untenable position of paying the claim without question and without any means by which to measure the validity or necessity of the treatment, or being sued for violating the law." Id. As a result, "the existence of the prejudice [was] self-evident." Id.; see also Chiropractic Care Centers, Inc. v. Arbella Mutual Insurance Co., 2012 WL 5830706, at *3 n.4

(Mass.App.Div. Nov. 14, 2012) (quoting Trinidad, 2009 WL 3844469, at *2).[8]

It is true that AA Insurance Company conducted an investigation and that the details of that investigation are not in the record. There is also no indication that plaintiff contacted AA Insurance after it received defendants' letter on March 13, 2012. Plaintiff did conduct examinations under oath of Harriet and Robert Kahn in November 2012. Plaintiff also obtained the deposition of Caruso taken in November 2012 in the 2009 lawsuit.

It is nevertheless undisputed that, before her death, Solomont never made a recorded statement about the accident. (Docket Entry # 27, Ex. M, p. 45). She did not keep a diary about any post accident medical treatment she received. She was never deposed. Solomont's bodily injuries are directly relevant to the underinsured motorist coverage in the Amica policy because the policy pays "damages for bodily injury to people

---

[8]  Trinidad and Chiropractic Care involved claims for personal injury protection benefits. Under both a Massachusetts statute, Mass. Gen. L. ch. 90, § 34M, and the policy language, the insureds were required to submit to an IME. Chiropractic Care Centers, Inc. v. Arbella Mutual Insurance Co., 2012 WL 5830706, at *2 n.3; Trinidad v. Pilgrim Insurance Co., 2009 WL 3844469, at *2. Prejudice is not required. Trinidad v. Pilgrim Ins. Co., 2009 WL 3844469, at *2. Separate and apart from the statute and the policy language, however, both courts addressed the existence of prejudice in dicta and found it "self-evident." Chiropractic Care Centers, Inc. v. Arbella Mutual Insurance Co., 2012 WL 5830706, at *2 n.3; Trinidad v. Pilgrim Insurance Co., 2009 WL 3844469, at *2.

injured or killed as a result of certain accidents caused by someone who does not have enough insurance." (Docket Entry # 25-1). Solomont is therefore a critical witness and the ability to conduct an IME and an examination under oath to determine the extent of her bodily injuries is likewise critical.

Thus, although usually the interests of plaintiff and AA Insurance coincide, see Goodman v. American Casualty Co., 643 N.E.2d at 435, here AA Insurance did not depose Solomont, a critical witness in this coverage dispute, or perform an IME. Depositions or examinations under oath of Caruso and defendants along with the medical records, to the extent they exist,[9] are not a substitute for a deposition of Solomont and a medical examination of Solomont conducted by a physician chosen by plaintiff. See generally VanHaaren v. State Farm Mutual Automobile Insurance Co., 989 F.2d 1, 4 n.1 (1st Cir. 1993) ("reasonable 'proof of loss' obligations serve a legitimate purpose, affording the insurer a more objective accounting of the insured's injuries or damages") (discussing IME clause). Furthermore, AA Insurance's interest in avoiding damages up to a maximum claim of $20,000 is not as strong as plaintiff's

---

[9] At the time of the November 2012 examination under oath, Harriet Kahn was trying to obtain the medical records of Solomont's primary care physician in Massachusetts. (Docket Entry # 27, Ex. M, p. 48). During Robert Kahn's examination under oath, plaintiff's counsel indicated that he had a portion of Solomont's medical records. (Docket Entry # 27, Ex. L, pp. 48-9).

interest in avoiding damages up to a per person claim limit of $250,000.[10]  See Goodman v. American Casualty Co., 643 N.E.2d at 435 (recognizing that "interests of each insurer" are "usually" similar with respect to damages resulting from occurrence).

In sum, plaintiff identified the precise manner in which it suffered actual or material prejudice.  As a result of the late notice, plaintiff could not depose or examine under oath Solomont who experienced the bodily injuries subject to coverage.  It also could not conduct a medical examination of her by a physician of its choosing to determine the scope and depth of her bodily injuries.  Through no fault of its own, plaintiff therefore experienced a "loss of critical evidence" (an IME) and testimony from a "material witness" (Solomont) as a result of defendants' failure to notify plaintiff in a timely manner.  See Darcy v. Hartford Insurance, Co., 554 N.E.2d at 31-32 (delay in notice may justify coverage denial with showing of "loss of critical evidence, or testimony from material witnesses").  The late notice resulted in actual harm to

_____

[10]  The $250,000 "per person" limit in the Amica policy applies "[i]f only one person sustains bodily injury . . .." (Docket Entry # 25-1, Part 12, p. 23).  The $500,000 "per accident" limit applies "if two or more people sustain bodily injury and are entitled to coverage under this Part . . .." (Docket Entry # 25-1, Part 12, p. 23).  Solomont, as a purported household member, was the only person potentially "entitled to coverage" under the Amica policy.  The $250,000 limit is further reduced by the amount of the $20,000 settlement.  (Docket Entry # 25-1, pp. 7-8).

plaintiff's interests because it deprived plaintiff of an important investigative means to defend its liability to pay damages and the amount of such damages.  Cf. id. at 34 (no reason to deny coverage when insurer's "interest has not been jeopardized by the insured's breach, in the sense that the insured's infraction does not seriously impair the insurer's investigation or defense of the action").  Finally, the length of delay remains a relevant factor, see id. at 31 (length of delay remains relevant factor), and the delay here was extensive.

Accordingly, there is no coverage under the Amica policy because plaintiff is entitled to deny coverage due to the late notice and the resulting material prejudice.  In light of this finding, it is not necessary to address whether Solomont is a member of defendants' household within the meaning of the policy or whether Solomont breached the policy by releasing AA Insurance and agreeing not to execute against Caruso's assets.

CONCLUSION

In light of the foregoing discussion, plaintiff's summary judgment motion (Docket Entry # 24) is **ALLOWED**.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge